IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2023 Term

_____

No. 21-0902

_____

FILED

**October 26, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

ROLAND F. CHALIFOUX, JR., D. O., individually and
ROLAND F. CHALIFOUX, JR., D. O., PLLC d/b/a
VALLEY PAIN MANAGEMENT CLINIC,

Plaintiffs Below, Petitioners,

v.

WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, WEST VIRGINIA BUREAU OF PUBLIC HEALTH,
LETITIA TIERNEY, M. D., J. D., individually and in her former capacity as
West Virginia Commissioner and State Health Officer, WEST VIRGINIA
BOARD OF OSTEOPATHIC MEDICINE, and DIANA SHEPARD,
individually and in her capacity as Executive Director for the
West Virginia Board of Osteopathic Medicine,

Defendants Below, Respondents.

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Jennifer F. Bailey, Judge
Civil Action No. 16-C-844

AFFIRMED

_____

Submitted:  September 13, 2023
Filed:  October 26, 2023

Scott H. Kaminski, Esq.
RAY, WINTON & KELLEY, PLLC
Charleston, West Virginia
Counsel for Petitioners

Perry W. Oxley, Esq.
L. R. Sammons, III, Esq.
Samantha J. Fields, Esq.
OXLEY RICH SAMMONS, PLLC
Huntington, West Virginia
Counsel for Respondents
West Virginia Board of Osteopathic
Medicine and Diana Shepard

Natalie C. Schaefer, Esq.
Caleb B. David, Esq.
Kimberly M. Bandy, Esq.
Shannon M. Rogers, Esq.
SHUMAN MCCUSKEY SLICER
PLLC
Counsel for Respondents West
Virginia Department of Health and
Human Resources, West Virginia
Bureau for Public Health, and Letitia
Tierney, M. D., J. D.

JUSTICE WOOTON delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.     "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

2.     "To the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc*., 188 W.Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability." Syl. Pt. 11, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A. B*., 234 W. Va. 492, 766 S.E.2d 751 (2014).

3.     "Before the prosecution of a lawsuit may be barred on the basis of res judicata, three elements must be satisfied. First, there must have been a final adjudication on the merits in the prior action by a court having jurisdiction of the proceedings. Second, the two actions must involve either the same parties or persons in privity with those same parties. Third, the cause of action identified for resolution in the subsequent proceeding either must be identical to the cause of action determined in the prior action or must be such that it could have been resolved, had it been presented, in the prior action." Syl. Pt. 4, *Blake v. Charleston Area Med. Ctr., Inc*., 201 W. Va. 469, 498 S.E.2d 41 (1997).

i

**WOOTON, Justice:**

Petitioners/plaintiffs below Dr. Roland F. Chalifoux, Jr., D. O. and Roland F. Chalifoux, Jr., D. O., PLLC d/b/a Valley Pain Management Clinic (collectively "Chalifoux") appeal the February 6, 2018, and October 4, 2021, orders entered by the Circuit Court of Kanawha County granting summary judgment to all respondents/defendants below. In the underlying action Chalifoux alleged that respondents West Virginia Department of Health and Human Resources, West Virginia Bureau for Public Health (the "Bureau"), and its former Commissioner and State Health Officer, Letitia Tierney, M. D., J. D., (collectively the "DHHR defendants") breached their duty of confidentiality by issuing a press release announcing that he and his clinic used unsafe injection practices and urging patients to seek testing for bloodborne illnesses. As against respondents West Virginia Board of Osteopathic Medicine (the "BOM") and its Executive Director, Diana Shepard (collectively the "BOM defendants"), Chalifoux asserted a due process claim for failure to provide a hearing within fifteen days of their summary suspension of his medical license as a result of the Bureau's investigation.

As to the DHHR defendants, the circuit court found that they were entitled to qualified immunity because the issuance of a press release identifying Chalifoux and his clinic was a discretionary act permitted by applicable regulations and Chalifoux produced no evidence that they did so fraudulently or maliciously. As to the BOM defendants, the circuit court found that Chalifoux's claim for damages for failure to provide a timely

1

hearing on his summary suspension could have been brought in a previously filed action for injunctive relief—which action was settled and dismissed—and was therefore barred by res judicata.

After careful review of the briefs of the parties, their oral arguments, the appendix record, and the applicable law, we find no error and therefore affirm the February 6, 2018, and October 4, 2021, orders of the circuit court.

## I. FACTS AND PROCEDURAL HISTORY

On October 22, 2013, a patient underwent an epidural steroid injection at Chalifoux's clinic, Valley Pain Management; later that evening she was diagnosed with bacterial meningitis and a report was made to the Bureau. The Bureau initiated an outbreak investigation that included an inspection of Chalifoux's clinic. During the initial inspection, Chalifoux allegedly told investigators that he did not wear masks during procedures other than placement of spinal cord devices. Laboratory results revealed that the specific flora cultured from the patient's meningitis was respiratory in nature which, coupled with Chalifoux's failure to wear a mask, caused the Bureau to conclude that the patient's meningitis was "highly suspicious for iatrogenic [i.e., related to medical treatment] transmission." No further meningitis cases were uncovered.

However, during the inspection of Chalifoux's clinic, investigators also purportedly identified unsafe, non-sterile injection techniques. Although the specifics of

Chalifoux's alleged techniques and the risk presented are disputed by the parties, the Bureau believed that Chalifoux admitted to "double-dipping" with syringes, i.e., entering a vial with a used syringe and then later using the vial for a different patient, creating a risk of bloodborne disease transmission. Following the initial inspection, the Bureau provided recommendations to correct these and other practices; in a follow-up inspection in December 2013, the Bureau's report noted the clinic undertook a "rapid and complete response" to the issues raised and that its procedures were then found to be "excellent." Nonetheless, the Bureau had residual concerns and recommendations.

More specifically, as a result of the alleged "double-dipping," the Bureau became concerned that the clinic posed a risk of bloodborne disease transmission among certain of its patient population. The Bureau contacted patients who underwent procedures in October 2013 and requested certain clinical records from Chalifoux to conduct a cross-match with the State's hepatitis and HIV registries to ascertain if any of his patients contracted or could have been a source of transmission of these diseases. Because some of the clinic's patients were from Ohio and Pennsylvania, the Bureau was also in contact with those states' public health officials during its investigation.

At the end of February 2014, Dr. Danae "Dee" Bixler of the Bureau, who led the investigation, determined that there had been no evidence of transmission,[1] the risk of transmission was low, and therefore opined in an internal memo that "no further action is necessary." However, upon further consultation with both Ohio officials and the Centers for Disease Control (the "CDC"), Dr. Bixler changed her mind about closing the investigation and accepted the CDC's recommendation that further patient notification was necessary given the seriousness of the potential risk. Despite the relatively few clinic patients identified on the registries, the concern was that other potentially infected patients had simply not been tested and therefore could have contracted and/or presented additional sources of transmission.

To narrow the scope of potential patients requiring notification, the Bureau requested additional clinic records and sent Chalifoux a questionnaire inquiring about his practices with specific medications and procedures.[2] In late April 2014, Chalifoux

---

[1] A small number patients who underwent procedures at the clinic were listed on the hepatitis C and human immunodeficiency virus ("HIV") registries; however, it was determined that none contracted the disease at the clinic.

[2] During this process, the Bureau continued to communicate with Chalifoux about the dangers of syringe reentry and continued use of leftover medications which had been potentially contaminated as a result of the syringe reentry. The Bureau underscores that at no time during the interviews or correspondence regarding the alleged unsafe procedures or the requests for information did Chalifoux ever take issue with the Bureau's characterization that he was "double-dipping." In fact, in the questionnaire provided to Chalifoux he responded "yes" to separate questions asking whether he reentered vials with the same syringe and whether he reused vials for other patients.
(continued . . .)

ostensibly began to balk at the scope of the records requests and retained counsel. Respondent Dr. Letitia Tierney ("Dr. Tierney") advised Chalifoux in writing that his refusal to cooperate "limit[ed]" the Bureau's choices in terms of notification and gave him a deadline to provide the requested records; her letter also referred Chalifoux to applicable regulations requiring, inter alia, the Bureau to notify patients of potential exposure. Internally at the Bureau, Dr. Tierney discussed Chalifoux's lack of response to the records request in an email stating that "I may need to send [a] letter to board of medicine about him and we need to get patient lists. . . . [I]f he doesn't cooperate, then we will put adds [sic] in the paper to notify his patients."

After Chalifoux continued to refuse the Bureau's additional records requests, Dr. Tierney filed a complaint with the BOM on July 17, 2014. In the complaint, Dr. Tierney stated that because Chalifoux refused to provide records to allow for a more targeted patient notification, a general announcement in the newspaper was necessary. However, she explained in sworn testimony that she and officials in Ohio and Pennsylvania had reached an agreement to refrain from publicizing the unsafe practices at that juncture.

---

However, Chalifoux insists these answers are misleading given the wording of the questionnaire. Essentially, Chalifoux argues that simply reentering a vial with the same syringe on the same patient creates no risk of infection transmission; it is only if that vial is *then* used on *another* patient that risk of transmission exists. He agrees that he reentered vials with the same syringe, and that he reused vials on other patients. However, he denies reentering a vial with the same syringe and then using that same vial with another patient. He contends that he only reused vials if they had only been entered with clean syringes.

5

Therefore, she decided to first pursue an administrative subpoena duces tecum to compel Chalifoux to produce the necessary records.

An administrative subpoena duces tecum seeking the additional records was issued on July 18, 2014.[3] However, before the subpoena was returnable, on July 21, 2014, public health officials in Ohio unexpectedly issued a press release urging the clinic's Ohio patients to seek out testing due to the Bureau having "identified possible, unsafe injection practices . . . which potentially exposed patients to blood-borne infectious diseases like hepatitis B, hepatitis C, and human immunodeficiency virus (HIV)." As a result of Ohio's press release, the Bureau began receiving a volume of calls from concerned West Virginia patients. The Bureau then determined that its own press release was necessary, purportedly to address citizen concerns. Therefore, on July 21, 2014—but subsequent to Ohio's press release earlier that day—the Bureau likewise issued a press release stating that Chalifoux's clinic "reused syringes to enter vials and saline bags used for more than one patient[]" and urging patients to seek testing.

As a result of Dr. Tierney's complaint to the BOM, the BOM held an emergency meeting and issued a "summary suspension" of Chalifoux's license on July 25, 2014. The suspension order states that the BOM found probable cause that Chalifoux engaged in conduct that departed from professional standards and that "there is an

---

[3] There was apparently considerable litigation in Marshall County, West Virginia, relative to the administrative subpoena duces tecum. *See infra* n.15.

immediate danger to the public" if he were to continue to practice. Pursuant to West Virginia Code of State Rules § 24-6-5.17 (2001),[4] the suspension order further advises that Chalifoux is "entitled to a hearing regarding this action within fifteen days of the date of suspension[]" and that he "should contact the Board as soon as possible so that a hearing may be scheduled within the proper time frame, unless the Respondent wishes to waive the fifteen-day time period." Although the circumstances surrounding the summary suspension hearing are heavily disputed, it appears undisputed that Chalifoux was never provided a hearing on the summary suspension by the BOM.[5]

*The Injunctive Action*

On August 21, 2014, Chalifoux filed a "Complaint and Petition for Permanent Injunction and Motion for Temporary Restraining Order or Injunctive Relief"

---

[4] West Virginia Code of State Rules § 24-6-5.17 provides the following with regard to summary suspension:

> The Board may suspend or refuse to renew a license pending a hearing if the health, safety or welfare of the public necessitates such summary action. The Board shall provide a hearing on the necessity for the summary action within fifteen (15) days after the suspension. The Board shall render its decision within five (5) days of the conclusion of a hearing under this section.

[5] In short, the BOM takes the position that Chalifoux either did not timely request such a hearing or affirmatively waived it through counsel. Chalifoux disputes both of these contentions while maintaining that the BOM is obliged to provide a hearing without affirmative action from him. Because the details of this dispute are not germane to our resolution, we will refrain from further belaboring the factual details on this issue.

(the "injunctive action") in the Circuit Court of Kanawha County against the BOM.  In his complaint, Chalifoux sought only to enjoin the BOM's summary suspension of his license. However, the complaint denied that an "outbreak" occurred, noted his voluntary provision of 1,600 patient files, his compliance with the inspection recommendations, and decried the Bureau's press release as "false and inflammatory."  The complaint further alleged that Chalifoux "has and will suffer irreparable harm without injunctive relief" from his suspension.[6]  The complaint demanded a hearing from the circuit court on the requested *injunction* but made no request that the circuit court order a hearing to be held by the BOM regarding the summary suspension[7] or underlying complaint.

A hearing on Chalifoux's request for injunctive relief was held on August 27, 2014; the next day, the circuit court granted the injunction, entering an order enjoining the enforcement of the summary suspension order and ordering that Chalifoux could

---

[6] By way of irreparable harm, Chalifoux claimed that 1) he "has likely lost patients"; 2) his malpractice insurance was set to expire on August 31 and if his license remained suspended, he would be unable to renew and required to pay a non-refundable $45,000 premium for tail coverage; and 3) he had to fire four employees.  Chalifoux further argued that public health would not be harmed as evidenced by the nearly one-year lapse since the incident at issue and that he was likely to succeed on the merits, claiming never to have "double-dipped."  He asserted that the BOM complaint was not grounded in his clinical practices, but rather a dispute over the Bureau's records request.

[7] Insofar as the summary suspension hearing is concerned, his complaint stated only that Chalifoux had requested a hearing but "the [BOM] ha[d] failed to act upon his request[,]" noting that "[f]ar more than fifteen (15) days have passed . . . and even after repeated requests" he had yet to receive a hearing.  Other than allowing Chalifoux to resume his practice, the circuit court's injunctive order afforded no further relief to Chalifoux or required any action of the BOM.

8

resume his practice "as if the summary suspension ha[d] not occurred." Other than a brief reference to Chalifoux's request for "a hearing to which he is entitled, pursuant to W. Va. Code R. § 24-6-5.17[,]" the order did not further address the summary suspension hearing or the underlying complaint.

Notably, the appendix record reflects that on December 15, 2014, the circuit court held a hearing on a motion to amend filed by Chalifoux in the injunctive action.[8] During the hearing, Chalifoux's counsel indicated that he sought to amend his complaint to add both Dr. Tierney and Cynthia Bean of the Bureau for Medical Services as parties, claiming that both were interfering with his ability to participate in the Medicaid program despite the order of suspension having been enjoined. Chalifoux further claimed the amendment was necessary to compel the State "to pay Dr. Chalifoux money which he is owed" from "prior to the time that his license was suspended."[9] The court held Chalifoux's motion to amend in abeyance, but indicated its willingness to allow the amendment and

---

[8] The appendix record contains a partial transcript of the hearing as exhibits to various filings, but not the underlying motion.

[9] There is no indication, however, that this monetary claim is directly associated with the due process claim asserted in the underlying action.

further suggested that a request for mandamus relief should also be added to the complaint to compel a hearing from the BOM if it did not occur in short order.[10]

Approximately ten months later, on October 26, 2015, the BOM dismissed the Bureau's complaint against Chalifoux, finding "no probable cause"; neither the parties nor the record indicate what precipitated the dismissal at this particular juncture. Approximately eight months later, on June 27, 2016, Chalifoux filed the underlying civil action. Five months later, by order entered November 29, 2016, the injunctive action was dismissed "with prejudice" upon the joint motion of the parties, stating that "all claims" against the BOM "in the above-styled action have been compromised and settled."[11]

*The Underlying Action*

As indicated above, while the injunctive action was still pending—and five months prior to its dismissal—Chalifoux filed the underlying civil action against the

---

[10] The majority of the hearing consisted of the circuit court expressing its dismay about the BOM's failure to provide Chalifoux with a hearing despite the over three-month passage of time since the injunction was issued. The BOM's counsel indicated that the BOM believed the court's injunctive order effectively nullified its ability to conduct a hearing because the order "erased" probable cause. The circuit court took issue with that reading of the order, denied that was its intention, and instead indicated that its intention was to allow Chalifoux to practice until a hearing could be held; regardless, the circuit court made clear that a hearing should be held as soon as possible.

[11] In March 2016, there was apparently a hearing on Chalifoux's motion to dissolve the injunction and dismiss the injunctive action; that motion and transcript are not in the appendix record and there is no clear indication why the injunctive action was not dismissed at that time.

DHHR and BOM defendants seeking monetary damages. Against the DHHR defendants, Chalifoux asserted that the issuance of the press release was defamatory and violated the confidentiality requirements of West Virginia Code of State Rules § 64-7-7.7 (2013) ("State Rule 7.7"). As against the BOM defendants, Chalifoux alleged that they violated his due process rights by summarily suspending him without a hearing.

After discovery, the DHHR defendants moved for summary judgment on the grounds of qualified immunity, which the circuit court granted. In its February 6, 2018, order, the circuit court concluded that the issuance of the press release was well within the DHHR defendants' discretion as per the regulations which authorize release of such information when there is a "clear and convincing need" to protect public health "as determined necessary by the Commissioner." *See id*. § 64-7-20.3 ("State Rule 20.3"). It further concluded that the DHHR defendants violated no clearly established law in issuing the press release and that Chalifoux failed to offer evidence that they acted fraudulently, maliciously, or oppressively, beyond mere "[s]peculation" and "opinion."[12]

Thereafter, the BOM defendants moved for summary judgment on the basis of: 1) qualified immunity; 2) collateral estoppel and res judicata; 3) absence of duty; and 4) quasi-judicial immunity. On October 4, 2021, the circuit court entered an order granting summary judgment to the BOM defendants on the basis of res judicata. The court found

---

[12] The order further addressed Chalifoux's purported defamation claim which it found failed as a matter of law; Chalifoux makes no mention of that claim on appeal.

11

that because Chalifoux's claim for damages "could have been asserted and litigated" in the injunctive action, it was barred by res judicata. The court observed that the damages Chalifoux asserted in the instant action were "raised and discussed, though no formal cause of action . . . was brought" in the injunctive action and concluded that such a claim was barred because res judicata applies not only to matters "'actually determined, but as to every other matter which the parties might have litigated as incident thereto[.]'" (citing Syl. Pt. 1, *In re Est. of McIntosh*, 144 W. Va. 583, 109 S.E.2d 153 (1959)).[13] This appeal of both the 2018 and 2021 orders followed.

## II. STANDARD OF REVIEW

As is well-established, "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

---

[13] Despite finding res judicata "dispositive," the circuit court's order nonetheless addresses the remaining grounds asserted in the BOM defendants' motion. The court found that the BOM defendants were entitled to qualified immunity for the summary suspension itself, which was an act within their discretion, but not entitled to immunity for "its failure to perform its non-discretionary duty to hold a hearing within fifteen days of the summary suspension." As to quasi-judicial immunity, the court found that the BOM was a quasi-judicial agency but was not performing a quasi-judicial function in failing to provide a summary suspension hearing. For much the same reasons, the court rejected the BOM defendants' "duty" arguments, finding that the regulations plainly create a non-discretionary duty to afford a hearing within fifteen days of a summary suspension.

Despite extensively briefing these issues in the instant appeal, the BOM defendants did not cross-assign these adverse rulings as error. For that reason, and because we find the circuit court's res judicata determination dispositive, it is unnecessary to address these issues for purposes of this appeal.

With this standard in mind, we will address the grant of summary judgment as to each set of defendants below.

## III.  DISCUSSION

### A.  The DHHR Defendants

As to the DHHR defendants, Chalifoux argues that the circuit court erred in finding they were entitled to qualified immunity in light of their breach of the "non-discretionary" confidentiality requirements of State Rule 7.7 by issuing the press release. State Rule 7.7, pertaining to "Other Reportable Events:  Disease Outbreaks or Clusters," provides, in part:

> The Commissioner or the local health officer *shall not disclose the identity of the* community, school, camp, daycare, *health care facility*, restaurant or food establishment, or other setting where an outbreak or cluster of disease occurs, *unless the release is necessary to inform the public to take preventive action to stop the spread of disease* or to notify providers or laboratories to identify additional cases of disease. . . .

*Id*. § 64-7-7.7 (emphasis added).  Chalifoux argues that the press release was not "necessary" under the rule because Dr. Tierney was merely attempting to compel Chalifoux to produce additional patient records for which she could have used the administrative subpoena process and avoided unnecessary publicity.  Chalifoux further argues that, even if Dr. Tierney's actions were discretionary, Dr. Bixler's conclusion that "no further action" was necessary, coupled with the timeline of events, suggests that there are genuine issues of material fact about whether Dr. Tierney nonetheless issued the press release for a

malicious purpose and therefore the DHHR defendants are unprotected by qualified immunity. [14]

The DHHR defendants counter that Dr. Tierney is expressly authorized to release otherwise confidential information when she deems it necessary for public health pursuant to State Rule 20.3: "In the case of a licensed facility, the Commissioner or a local health officer may release confidential information to the public when there is a clear and convincing need to protect the public's health *as determined necessary by the Commissioner*." *Id*. § 64-7-20.3 (emphasis added). They argue that Dr. Tierney testified that she found the press release necessary because Chalifoux refused to provide additional records which would have helped narrow the scope of a targeted patient notification and, more importantly, because Ohio proceeded with its press release causing alarm among West Virginia patients who read it. As for Dr. Bixler's statement that "no further action" was necessary, the DHHR defendants argue that Chalifoux entirely ignores Dr. Bixler's

---

[14] The Court has held that "on occasion, the State will be entitled to immunity when the official is not entitled to the same immunity; in others, the official will be entitled to immunity when the State is not." Syl. Pt. 9, in part, *Parkulo v. W. Va. Bd. of Prob. and Parole*, 199 W. Va. 161, 483 S.E.2d 507 (1996). However, in either event, when the conduct involved is discretionary, a plaintiff must first demonstrate a violation of a clearly established right or that it was otherwise fraudulent, malicious, or oppressive. *See* Syl. Pt. 11, in part, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A. B*., 234 W. Va. 492, 766 S.E.2d 751 (2014). "In absence of such a showing, *both* the State and its officials or employees charged with such acts or omissions are immune from liability." *Id*. (emphasis added). Because we find that Chalifoux has failed to make such a showing, we treat the DHHR defendants collectively for purposes of our qualified immunity discussion.

explanation that she reconsidered her decision about further patient notification upon advice from the CDC.

Although Chalifoux characterizes the DHHR defendants' actions as violative of the "non-discretionary" duty of confidentiality contained in State Rule 7.7, he offers no meaningful rebuttal to the explicit discretionary authority granted to Dr. Tierney in State Rule 20.3 to release such confidential information if deemed necessary for public health. As such, he identifies no clearly established right or law violated by the DHHR defendants. Therefore, we limit our analysis to whether there is a genuine issue of material fact about whether her actions, although discretionary, were otherwise fraudulent, malicious, or oppressive such as to strip the DHHR defendants of qualified immunity as instructed by our holding in syllabus point eleven of *A. B.*:

> To the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability.

234 W. Va. at 49, 766 S.E.2d at 756, Syl. Pt. 11.

Admittedly, this Court has recognized that, generally, "whether a state actor's conduct was malicious is a 'question[] for the fact-finder.'" *W. Va. Div. of Nat. Res. v. Dawson*, 242 W. Va. 176, 191, 832 S.E.2d 102, 117 (2019) (quoting *Maston v. Wagner*, 236 W. Va. 488, 508 n.15, 781 S.E.2d 936, 956 n.15 (2015)). However, Chalifoux offers the Court no direct evidence of malice or fraud, arguing only that the timeline of events permits an inference of Dr. Tierney's attempt to "ruin" Chalifoux because she "simply did not like [him] and was intent on teaching him a lesson." Chalifoux offers no evidence that Dr. Tierney did not like him or any indication as to why she would be motivated to "ruin" him other than his suggestion that she took umbrage at his refusal to "assent to her every whim" by producing the requested records. He maintains that Dr. Tierney "threaten[ed]" him by stating in an email that she "may" need to send a letter to the BOM and that newspaper ads may be needed for patient notification "if he doesn't cooperate[.]" Clearly, however, these statements merely outline the options provided in the applicable regulations that were available to her in the exercise of her discretion.

In that regard, we find that Chalifoux has failed to offer evidence upon which a reasonable jury could conclude that the DHHR defendants' actions were malicious or fraudulent; in fact, the entirety of his claim against the DHHR defendants is premised on acts that the DHHR defendants were legally obligated to perform. West Virginia Code of State Rules § 64-7-7.4 requires that the DHHR defendants undertake an "appropriate investigation" of a possible outbreak to include "[c]ase-finding." State Rule § 64-7-7.4.d.3 provides that such "[c]ase-finding" includes "[p]ublic notification to identify and report

16

additional cases," if other means of case-finding are not feasible. While confidentiality is generally required by State Rule 7.7, the language of that provision itself permits disclosure of the involved clinic if "necessary to inform the public to take preventive action to stop the spread of disease[.]" *Id*. § 64-7-7.7. This discretionary judgment to release confidential information is reiterated in State Rule 20.3, permitting disclosure where there is "a clear and convincing need to protect the public's health." *Id*. § 64-7-20.3; *see also id*. § 64-7-7.9 (providing that the Commissioner "shall" notify patients found to be "at risk" of exposure and "[i]n the course of notification of the patient, the Commissioner may identify a health care provider or health care facility to the extent necessary to inform the patient of the nature of the exposure or possible exposure.").

Chalifoux does not dispute that he refused to voluntarily provide the requested additional records for targeted patient notification and identifies nothing which requires the DHHR defendants to first utilize an administrative subpoena duces tecum to compel him to provide that information. *Cf. W. Va. Dep't of Health & Hum. Res. v. Payne*, 231 W. Va. 563, 573, 746 S.E.2d 554, 564 (2013) (finding no violation of clearly established law where regulations provide that agency "'may'" conduct additional inspections "but is not required to do so."). In attempting to articulate how his claim evades qualified immunity, Chalifoux on the one hand chastises Dr. Tierney's "haste" in filing the BOM complaint and press release before she "allowed [the administrative subpoena]

17

process to play out,"[15] yet professes to be "stagger[ed]" by her "wait[ing] nearly three months" to take these actions if she "was so concerned about the public health risk[.]"

At base, Chalifoux's arguments are precisely the type of second-guessing from which qualified immunity protects State officials acting within their discretionary authority. Dr. Tierney plainly had regulatory authority to issue the press release if "determined necessary" for public health—that necessity was created by Chalifoux himself by failing to cooperate in developing a narrowly focused patient notification list. In that regard, he bemoans nothing more than Dr. Tierney's exercise of legislatively granted discretion to fulfill her mandatory duties as the State's public health officer. As we have explained, "the purpose of qualified immunity is to allow officials to do their jobs and to exercise judgment, wisdom, and sense without worry of being sued." *W. Va. Bd. of Educ. v. Marple*, 236 W. Va. 654, 661, 783 S.E.2d 75, 82 (2015). We therefore find no error in the circuit court's conclusion that the DHHR defendants are entitled to qualified immunity and its grant of summary judgment on that basis.

B. *The BOM Defendants*

As to the BOM defendants, the circuit court found that Chalifoux could have brought his claim for damages for their failure to provide a summary suspension hearing

---

[15] Counsel for the DHHR defendants represented during oral argument that the litigation of the miscellaneous action regarding the administrative subpoena duces tecum was protracted, lasting for approximately fourteen months.

in the injunctive action but failed to do so and therefore the claim is barred by res judicata. Although the BOM defendants argue in support of the circuit court's reasoning, we note that at no time below did the BOM defendants argue that Chalifoux's claim was barred because he "could have brought" his claim for damages in the injunctive action. Instead, the BOM defendants obtusely argued—somewhat interchangeably—that Chalifoux's claim was barred by both collateral estoppel and res judicata, because "the issue of a hearing" had been "discussed" in the injunctive action and therefore had been "heard" and "adjudicated[.]"

Chalifoux, for his part, likewise conflates the concepts of collateral estoppel and res judicata in his briefing before the Court, relying primarily on caselaw regarding collateral estoppel and focusing largely on the fact that his damages were not "actually litigated" in the injunctive action, rather than whether he could have brought the claim in the injunctive action as determined by the circuit court. Therefore, before addressing the circuit court's ruling, we pause to address the confounding tenor of the BOM defendants' arguments below and to clarify the distinction between the related, but independent, concepts of collateral estoppel and res judicata.

In their motion for summary judgment, the BOM defendants argued that because Chalifoux "had a hearing" in the circuit court "related to the issues underlying his summary suspension" and "whether his license should be restored," res judicata and/or

19

collateral estoppel applied.[16]  In effect, the BOM defendants argued that because the *circuit court* conducted a hearing and enjoined suspension of his license, Chalifoux had received the hearing and potential relief *the BOM* was obligated to provide.  They then argued that the underlying action merely sought a different iteration of the relief Chalifoux had already obtained.  In so doing, the BOM defendants commingle the rights being vindicated through the summary suspension hearing, the injunctive action, and the underlying action for damages—all to bolster its argument that the instant action was previously "adjudicated" for res judicata purposes.

However, it is apparent that each of the various hearings and actions serve different purposes and afford different relief.  By rule, Chalifoux was entitled to a hearing from the BOM on the merits of the summary suspension, i.e., whether immediate suspension pending the investigation and adjudication of the BOM complaint was warranted.  *See* W. Va. Code R. § 24-6-5 (requiring hearing within fifteen days on "the necessity for the summary action" when summary suspension is utilized).  It is also clear that the injunctive hearing held by the circuit court did not serve to replace the required summary suspension hearing, but rather, was intervening relief granted pursuant to the court's statutory authority because Chalifoux had not yet been afforded that required hearing.  *See* W. Va. Code § 53-5-4 (1923).  This relief served only to assess the immediate

---

[16] In particular, the BOM defendants argued below that Chalifoux was "afforded due process and had an extensive hearing related to the merits of the summary suspension"—ostensibly referring to the injunctive hearing—and therefore his claims in the instant case had been "adjudicated[.]"

necessity of Chalifoux's license suspension pending his receipt of a summary suspension hearing from the duly-authorized entity—the BOM, which is knowledgeable about the public health implications of the underlying allegations against Chalifoux and the necessity of immediate action relative to his license until that complaint could be resolved. *See Ne. Nat. Energy LLC v. Pachira Energy LLC*, 243 W. Va. 362, 370, 844 S.E.2d 133, 141 (2020) ("'[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981))).

Moreover, regardless of whether the BOM defendants viewed the injunctive relief granted by the circuit court as the functional equivalent of its own hearing on Chalifoux's summary suspension, it is apparent that the underlying civil action seeks an entirely different form of relief as a consequence of the BOM defendants' failure to provide that hearing. Chalifoux's complaint asserts a classic due process deprivation claim seeking monetary damages. He did not seek relief from his summary suspension or even the underlying BOM complaint in the instant action, but rather damages flowing from the due process deprivation allegedly committed by the BOM defendants by failing to provide the summary suspension hearing. As such, the BOM defendants' insistence below that the "exact issue asserted in the Complaint . . . [was] heard before the Circuit Court of Kanawha County . . . [and] . . . adjudicated" is patently incorrect. Therefore, to the extent Chalifoux argues that the instant claim was not "actually litigated" in the injunctive action, he is

21

correct. However, as discussed *infra*, this conclusion is not dispositive for purposes of res judicata.

Turning now to the parties' intermingling of the concepts of collateral estoppel and res judicata, we observe that they differ in both scope and effect. Collateral estoppel pertains to "issue" preclusion and requires that an identical issue have been "actually litigated" among the parties or their privies in other litigation. Res judicata pertains more broadly to "claim" preclusion and bars relitigation of claims that were either actually litigated or *could have been* litigated in other proceedings. As commentators have explained:

> [R]es judicata or claim preclusion bars the litigation of not only issues that were actually litigated, but also issues that could have been litigated, might have been litigated, or should have been litigated in the original suit or former proceedings. In this respect, res judicata, or claim preclusion, is a broader remedy than collateral estoppel which applies only to issues that were actually litigated.

46 Am. Jur.2d *Judgments* § 454 (2d ed. 2023) (footnotes omitted); *see Slider v. State Farm Mut. Auto. Ins. Co.*, 210 W. Va. 476, 481, 557 S.E.2d 883, 888 (2001) ("Claim preclusion therefore functions as a rule governing the joinder of claims and defenses, since a party's failure to present a particular issue in the course of litigation may preclude its determination in a subsequent action."); *cf. State v. Miller*, 194 W. Va. 3, 9 n.6, 459 S.E.2d 114, 120 n.6 (1995) ("[C]ollateral estoppel is narrower [than res judicata] because it does not apply to matters that could have been litigated but were not.").

Therefore, although we agree that Chalifoux's due process claim was not "actually litigated" in the injunctive action, this Court has repeatedly emphasized that res judicata also applies to matters that could have been litigated in other proceedings: "[I]t is well-established that res judicata applies not only to matters *actually litigated*, but to matters which *could have been* litigated." *Bison Ints., LLC v. Antero Res. Corp.*, 244 W. Va. 391, 398, 854 S.E.2d 211, 218 (2020); *see Miller*, 194 W. Va. at 9, 459 S.E.2d at 120 ("*Res judicata* generally applies when there is a final judgment on the merits which precludes the parties or their privies from relitigating the issues that were decided *or the issues that could have been decided in the earlier action*." (Emphasis added)); *Blake v. Charleston Area Med. Ctr., Inc.*, 201 W. Va. 469, 477, 498 S.E.2d 41, 49 (1997) *("[R]es judicata* may operate to bar a subsequent proceeding even if the precise cause of action involved was not actually litigated in the former proceeding so long as the claim could have been raised and determined."); *Lloyd's, Inc. v. Lloyd*, 225 W. Va. 377, 383, 693 S.E.2d 451, 457 (2010) (finding res judicata barred subsequent action although "not identical to the cause of action determined in the previous civil action[]" because the claim could have been resolved in previous action); *Dan Ryan Builders, Inc. v. Crystal Ridge Dev., Inc.*, 239 W. Va. 549, 561, 803 S.E.2d 519, 531 (2017) ("West Virginia's law of *res judicata* prohibits not only the re-litigation of claims that were actually asserted in the prior action, but also precludes 'every other matter which the parties might have litigated as incident thereto[.]'").

23

In that regard, the circuit court concluded that Chalifoux could have litigated his due process claim for damages in the injunctive action, finding that all three required elements of res judicata were satisfied pursuant to syllabus point four of *Blake*:

> First, there must have been a final adjudication on the merits in the prior action by a court having jurisdiction of the proceedings. Second, the two actions must involve either the same parties or persons in privity with those same parties. Third, the cause of action identified for resolution in the subsequent proceeding either must be identical to the cause of action determined in the prior action or must be such that it could have been resolved, had it been presented, in the prior action.

201 W. Va. at 469, 498 S.E.2d at 41, Syl. Pt. 4, in part. Although largely preoccupied with whether his claim was "actually litigated," Chalifoux does offer mild opposition to each of the *Blake* elements—including whether his claim "could have been" litigated—which we must address.

First, Chalifoux argues that the injunctive action and the instant action do not involve a "prior action" and a "subsequent proceeding" as contemplated by *Blake* because the two actions were pending *simultaneously* for a period of time. However, the terms "prior" and "subsequent" in our res judicata jurisprudence do not refer only to actions filed and pending in succession to each other. Rather, it is generally understood that when two claims are pending contemporaneously, whichever action reaches a final adjudication first is res judicata as to the other. *See* Restatement (Second) of Judgments § 14 (Am. L. Inst. 1982) ("[W]hen two actions are pending which are based on the same claim, or which

involve the same issue, it is the final judgment first rendered in one of the actions which becomes conclusive in the other action (assuming any further prerequisites are met), regardless of which action was first brought."); *see also* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac. & Proc. Juris. § 4404 (3d ed. 2023) ("[A]s between actions pending at the same time, res judicata attaches to the first judgment regardless of the sequence in which the actions were commenced." (footnote omitted)).

As to *Blake's* second requirement, Chalifoux argues that the instant case does not involve the "same parties" as there are parties to this action in addition to those named in the injunctive action—namely, his clinic is an additional plaintiff and Dr. Shepard is an additional defendant. However, he fails to address whether these parties are "in privity" with those named in the injunctive action, as prescribed by *Blake*. We have little difficulty concluding that Chalifoux stands in privity with his clinic which organizationally bears his name and to which he refers to as "his business" throughout his pleadings and briefs. *See Jordache Enters., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 204 W. Va. 465, 478, 513 S.E.2d 692, 705 (1998) ("'In general, it may be said that . . . privity involves a person so identified in interest with another that he represents the same legal right.'" (citations omitted)). Further, Dr. Shepard, as the Executive Director of the BOM, plainly stands in privity with the BOM for purposes of Chalifoux's allegations in this matter. *See Baker v. Chemours Co. FC, LLC,* 244 W. Va. 553, 562, 855 S.E.2d 344, 353 (2021) ("'[C]ommon interests implicit in an employment relationship ordinarily would tend to bind employers

25

and employees in privity for the purpose of res judicata[.]'" (quoting *Warner v. German*, 642 A.2d 239, 245 (Md. 1994))).

As to the third and final element of the *Blake* test, Chalifoux contends that he could not have brought his claim for damages in the injunctive action because those damages had not yet accrued at the time the injunctive action was filed. The BOM defendants counter that the injunctive complaint alleges that Chalifoux "has" suffered "irreparable harm" and therefore Chalifoux conceded that he had already incurred damages at that time. More importantly, the BOM defendants briefly note that Chalifoux had over two years during the pendency of the injunctive action to amend his complaint to assert the claims in the instant case but simply chose, at his peril, to file a separate action instead. We agree.

The Court has recently held that claims or damages which accrue during the pendency of an action but were not initially pled must also be raised in that action lest they be barred by res judicata. In *Baker,* the Court addressed an employee's attempt to file a new action to redress additional incidents of discrimination and harassment which "post-dated" incidents alleged in a previously filed action but which occurred while that action was pending. 244 W. Va. at 559, 855 S.E.2d at 350. The Court rejected the employee's attempt to evade res judicata on that basis because "it treats the allegations in the [initial] complaint as if they were fixed and immutable, incapable of amendment or supplementation pursuant to Rule 15 of the West Virginia Rules of Civil Procedure[.]" *Id*.

26

The *Baker* Court drew particular emphasis to Rule 15's language permitting supplementation of pleadings to accommodate "'*transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented.*'" *Id.* Therefore, regardless of whether Chalifoux's damages were fully realized at the time of filing of the injunctive action, they clearly accrued during its pendency as evidenced by the filing of the instant action alleging those very damages five months before the injunctive action's dismissal.

Further, Chalifoux provides no reason why he could not have amended his injunctive complaint to plead his due process claim. Indeed, such a position would be wholly disingenuous given that he did, in fact, seek to amend his complaint to add additional parties and claims approximately four months after the injunctive action was filed. As previously stated, Chalifoux filed a motion to add Dr. Tierney—one of the DHHR defendants below—and Cynthia Bean of the Bureau for Medical Services as parties to the injunctive action to advance a claim against them for alleged "interference" in his Medicaid participation, along with a claim for damages for Medicaid reimbursements previously owed to him. *See supra* n.9. Although the circuit court held that motion in abeyance, the hearing transcript reflects that the court was not only amenable to this amendment to enlarge the scope of the litigation, but even invited Chalifoux to *further* amend his

complaint to seek mandamus relief against the BOM to obtain the required hearings regarding his licensure and/or the underlying BOM complaint.[17]

Instead, Chalifoux appears to take the position that there is nothing that "requires" him to bring all of his claims against the defendants and their privies stemming from the same set of underlying facts within the same action. To the contrary, the application of res judicata requires him to do so. The Court has warned that where a plaintiff makes "the strategic decision to pursue [] claims in a piecemeal fashion, asserting different theories and measures of relief" in different actions, res judicata may constitute a bar. *Dan Ryan*, 239 W. Va. at 562, 803 S.E.2d at 532. Like the plaintiff in *Dan Ryan*, Chalifoux "plainly could and should have pursued all of [his] factually intertwined claims" in the injunctive action. *Id.* Chalifoux's requested amendment to add Dr. Tierney and others to the injunctive action for purposes of addressing the Medicaid fallout from his suspension demonstrates the feasibility of amendment to encompass any additional claims arising from the same underlying facts.[18]

---

[17] In addressing Chalifoux's motion, the circuit court stated: "If the [BOM] has not scheduled and provided the necessary hearings, then I will grant your complaint—or your amendment. But also I want you to amend, if you would, your complaint to add a cause of action for the issuance of a rule to show cause for mandamus." The court further addressed counsel's request to add additional parties and claims stating "you can turn it into a monstrous piece of litigation with the additional allegations[.]"

[18] Chalifoux also briefly mentions that the BOM defendants litigated the case for several years before asserting res judicata in their motion for summary judgment. Although (continued . . .)

"'The doctrine of res judicata reflects the refusal of the law to tolerate a multiplicity of litigation[.]'" *Bison Ints.,* 244 W. Va. at 402, 854 S.E.2d at 222 (quoting

---

Chalifoux's argument regarding the BOM defendants' acquiescence to the litigation of the instant action could be generously read as alluding to the BOM defendants' "waiver" of the affirmative defense of res judicata, we observe that he never invokes that term nor provides any authority in support.

Nonetheless, we are compelled to acknowledge that neither of the BOM defendants expressly asserted the affirmative defense of res judicata in their respect answers. Instead, the answers individually and specifically assert a variety of other affirmative defenses and only generally assert "any and all defenses afforded to [them] by Rules 8 and 12 of the West Virginia Rules of Civil Procedure." Rule 8(c) provides, in part:

> In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, *res judicata*, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense.

(Emphasis added); *see Dan Ryan*, 239 W. Va. at 557 n.23, 803 S.E.2d at 527 n.23 ("*Res judicata*/claim preclusion is an affirmative defense that should be raised under Rule 8(c) of the *Rules of Civil Procedure*."). If it is not raised in the answer, it is typically deemed waived. *See, e.g., Davignon v. Clemmey*, 322 F.3d 1, 15 (1st Cir. 2003) ("As an affirmative defense enumerated in Federal Rule of Civil Procedure 8(c), normally res judicata is deemed waived unless raised in the answer."); *but see Dan Ryan*, 239 W. Va. at 557 n.23, 803 S.E.2d at 527 n.23 ("[A] party may raise *res judicata* by summary judgment motion when the defense was unavailable at the time of the original answer.").

However, because Chalifoux at no point—either below or before this Court— expressly argues or provides supporting authority for the proposition that the BOM defendants waived the defense of res judicata, we decline to grant him relief from its effects on this basis. *See* Syl. Pt. 13, *A. B.*, 234 W. Va. at 497, 766 S.E.2d at 757 ("The Court takes the pleadings and record as it finds them and the adversarial process makes it incumbent on the parties to plead the causes of action and present the requisite evidence necessary to maintain viability of their case. Courts cannot concoct or resurrect arguments neither made nor advanced by the parties.").

*Franklin Collection Serv., Inc. v. Stewart*, 863 So.2d 925, 929 (Miss. 2003)). More specifically, it precludes "'piecemeal litigation'" occasioned by splitting "'different legal theor[ies] . . . for different relief'" into serial litigation. *Dan Ryan*, 239 W. Va. at 559, 803 S.E.2d at 529 (quoting *Gonzales v. California Dep't of Corr.*, 739 F.3d 1226, 1232 (9th Cir. 2014)). Just as we observed in *Dan Ryan*, "[West Virginia Rule of Civil Procedure] 18(a) allows [a] party to . . . join . . . 'as many claims, legal or equitable, as the party has against'" another party and Chalifoux "deliberately chose not to avail [him]self of this process." 239 W. Va. at 562, 803 S.E.2d at 532.[19] We therefore find no error in the circuit court's conclusion that Chalifoux could have brought his due process claim in the injunctive action and its grant of summary judgment to the BOM defendants as a result.

---

[19] Rule 18(a) of the West Virginia Rules of Civil Procedure provides: "A party asserting a claim to relief as an original claim, counterclaim, cross-claim, or third-party claim, may join, either as independent or as alternate claims, as many claims, legal or equitable, as the party has against an opposing party."

As a corollary to this rule and as a final matter, we note Chalifoux's terse insistence that the BOM defendants could simply have moved to consolidate the two actions. However, he provides neither a discussion of Rule 42 of the West Virginia Rules of Civil Procedure nor its interplay, if any, with res judicata. More importantly, he fails to articulate why the burden of seeking consolidation to cure the preclusive effects of res judicata on his own case falls on the BOM defendants.

## IV. CONCLUSION

For the foregoing reasons, we affirm the February 6, 2018, and October 4, 2021, orders of the Circuit Court of Kanawha County, West Virginia.

Affirmed.